IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Judith Schlueter,

    Plaintiff,

v.

Bethesda Healing Ministry, Inc.

    Defendant.

Case No: 2:17-cv-1055

Judge Graham

Magistrate Judge Vascura

<u>Opinion and Order</u>

Plaintiff Judith Schlueter brings this copyright infringement action against defendant Bethesda Healing Ministry, Inc. ("BHM"). Ms. Schlueter founded BHM in 1994 and served as its Executive Director until her forced resignation in 2017. She authored a manual, "A Guidebook to Healing," which BHM has used in its ministry to women affected by abortion. Ms. Schlueter alleges that BHM has, without right or permission, continued to use and distribute her manual after she left BHM.

Currently pending before the Court is BHM's motion to disqualify plaintiff's counsel, Thomas Gjostein, who is identified in the amended complaint as plaintiff's local counsel. BHM argues that Mr. Gjostein should be disqualified because of a conflict of interest, namely that he provided legal advice to BHM on numerous matters, including copyright protection of the manuals used by BHM.

For the reasons stated below, BHM's motion to disqualify plaintiff's counsel is granted.

**I.    Legal Standard**

"A motion to disqualify counsel is the proper method for a party to bring an alleged breach of ethical duties to the court's attention." <u>Kitchen v. Aristech Chem.</u>, 769 F.Supp. 254, 256 (S.D. Ohio 1991). The power to disqualify an attorney from a case "is incidental to all courts, and a district court is obliged to consider unethical conduct by any attorney in connection with any proceeding before it." <u>SST Castings, Inc. v. Amana Appliances, Inc.</u>, 250 F.Supp.2d 863, 865 (S.D. Ohio 2002). Even so, courts should treat motions to disqualify counsel "with extreme caution" because denying an opponent the services of counsel is a powerful weapon that can be misused. <u>Id</u>. at 865-66 (citing <u>Freeman v. Chicago Musical Instrument Co.</u>, 689 F.2d 715, 722 (7th Cir. 1982)); <u>see also</u> <u>Manning v. Waring, Cox, James, Sklar & Allen</u>, 849 F.2d 222, 224 (6th Cir. 1988).

In considering a motion to disqualify counsel, a court must use its discretion in balancing the "competing public interests of requiring professional conduct by an attorney and of permitting a party to retain counsel of his choice." Kitchen, 769 F.Supp. at 257. "The extreme sanction of disqualification should only be utilized when there is a 'reasonable possibility that some specifically identifiable impropriety' actually occurred, and where the public interest in requiring professional conduct by an attorney outweighs the competing interest of allowing a party to retain counsel of his choice." SST Castings, 250 F.Supp.2d at 865 (quoting Kitchen, 769 F.Supp. at 257).

The Court's local rules incorporate the ethical standards of the Ohio Rules of Professional Conduct. See S.D. Ohio Local Civ. R. 83.3(h); Model Fed. R. of Disciplinary Enforcement IV(B). Several of the Ohio Rules are relevant to this case.

Under Rule 1.7 (Conflict of Interest: Current Clients): "A lawyer's acceptance or continuation of representation of a client creates a conflict of interest if . . . there is a substantial risk that the lawyer's ability to consider, recommend, or carry out an appropriate course of action for that client will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by the lawyer's own personal interests." Ohio R. Prof. Conduct 1.7(a)(1).

Under Rule 1.9 (Duties to Former Clients), "Unless the former client gives informed consent, confirmed in writing, a lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client." Ohio R. Prof. Conduct 1.9(a).

And under Rule 1.13 (Organization as Client): "A lawyer employed or retained by an organization represents the organization acting through its constituents. A lawyer employed or retained by an organization owes allegiance to the organization and not to any constituent or other person connected with the organization. The constituents of an organization include its owners and its duly authorized officers, directors, trustees, and employees." Ohio R. Prof. Conduct 1.13(a).

In evaluating the motion to disqualify counsel, the Court thus examines whether an attorney-client relationship existed between Mr. Gjostein and BHM and, if so, whether his representation included a matter that is the same or substantially related to subject matter of this lawsuit. See Dana Corp. v. Blue Cross & Blue Shield Mut. Of N. Ohio, 900 F.2d 882, 889 (6th Cir. 1990); SST Castings, 250 F.Supp.2d at 867. "The party moving for disqualification bears the initial burden of persuasion and proof on its motion." In re Nat. Century Fin. Enterprises. Inc. Fin. Inv. Litig., No 2:03-md-1565, 2010 WL 1257598, at *6 (S.D. Ohio Mar. 29, 2010).

**II.    Discussion**

   **A.    The Parties' Arguments**

It is undisputed that plaintiff's counsel, Mr. Gjostein, served as a member of BHM's Board of Directors from May 2009 until April 2011.  Gjostein Decl. ¶ 3.  The parties agree that there was no formal, written attorney-client agreement between Mr. Gjostein and BHM.  It is also undisputed that during that time BHM had no legal counsel on staff or on a retained basis.  Id. at ¶ 5.

The parties, however, offer diverging characterizations of the rest of the facts.  Mr. Gjostein states that he regularly attended and participated in Board meetings.  He became informed of BHM's ministry, finances and administration.  He brought his life experience to his role as a Board member. But he claims that whenever a question in the legal realm arose, he routinely told the Board that he was not an attorney for BHM and that any statements he contributed to the discussion were not to be treated as legal advice.  See Gjostein Decl. ¶¶ 4, 7-8.

BHM counters that Mr. Gjostein became more than a Board member who happened to be an attorney.  BHM submits emails and Board meeting minutes for the proposition that Ms. Schlueter and Board members looked to Mr. Gjostein on matters for which legal advice was needed or helpful. According to BHM, his provision of advice on legal issues caused them to reasonably believe that he was acting as legal counsel for the organization.

   **B.    The Existence of an Attorney-Client Relationship**

In determining whether an attorney-client relationship existed, the "test is essentially 'whether the putative client reasonably believed that the relationship existed and that the attorney would therefore advance the interests of the putative client.'"  Hamrick v. Union Twp., Ohio, 79 F.Supp.2d 871, 875 (S.D. Ohio 1999) (quoting Henry Filters, Inc. v. Peabody Barnes, Inc., 82 Ohio App.3d 255, 261, 611 N.E.2d 873, 876 (Ohio 1992)).

Much of the evidence initially submitted by BHM would not persuade the Court that BHM had satisfied its burden of establishing a "reasonable possibility that some specifically identifiable impropriety actually occurred."  Kitchen, 769 F.Supp. at 257.  The emails and meeting minutes attached to the original motion show that BHM's officers and Board members tended to rely more heavily upon the statements of Mr. Gjostein on certain topics because he was a lawyer.  For instance, the minutes of a December 1, 2009 meeting noted that Mr. Gjostein thought that a lease which BHM had with another entity was "not a good one [because] the burden is on Bethesda for too much." Doc. 8-3 at PAGEID #70.  His opinion caused the Board to address the idea of modifying the lease at the next Board meeting.  But crediting the declaration of Mr. Gjostein, as an officer of the Court,

3

the Court would be inclined to construe this initial evidence as showing that Mr. Gjostein gave input that a non-lawyer could have given and stopped short of providing legal advice. That is, the Court would view the December 1, 2009 meeting minutes as showing that Mr. Gjostein was simply making a common-sense observation about the lease that did not require legal training to make.

However, BHM has submitted supplemental evidence, discovered after the filing of its motion, which causes the Court not to credit Mr. Gjostein's declaration. In an April 5, 2011 email from Mr. Gjostein to Board Chair Greg Eckert and copied to Ms. Schlueter, Mr. Gjostein affirmatively stated that he was giving them "legal advice": "The following legal advice is in response to our talk on April 4, 2011 and must be disclaimed that I am precluded from ever promising or guaranteeing a particular result." Doc. 31-1 at PAGEID 338. Mr. Gjostein, who was not going to be able to attend the Board meeting later that day, instructed that his email of "legal advice" be incorporated into the meeting minutes, and it was. Id. at PAGEID 339.

Mr. Gjostein's email, as incorporated into the meeting minutes, advised the Board on three different legal matters. The first related to BHM's use of "Catholic Adult Education Series" DVDs. Mr. Gjostein stated that he had determined who owned the rights to the DVDs and had spoken with a representative of the copyright owner about reaching an understanding as to BHM's ability to use the DVDs. He suggested that BHM's use would be "educational," and he stated that he was standing by earlier advice he had given to Ms. Schlueter and Mr. Eckert that BHM need not buy copies of the DVDs because there was "enough gray area in the [U.S.] Code that makes our borrowing it valid in my opinion." Id. Upon hearing this advice, the Board agreed that BHM should borrow copies of the DVDs. Id. at PAGEID 340.

Second, Mr. Gjostein addressed a question about whether BHM was subject to federal equal employment opportunity laws. He stated that he wanted to "check the case law," but expected that it would "confirm my opinion that BHM does not qualify under the Code to be governed in this area." Id. at PAGEID 339. He advised that BHM could make hiring decisions without regard to those laws, which caused the Board to conclude that "BHM is not an EEOC [employer]." Id. at PAGEID 340.

Third, Mr. Gjostein discussed an insurance liability issue in the context of the piercing-the-corporate veil doctrine. He stated the basic rule of law about the doctrine and promised to do further legal research. He added, "my belief is that our insurance would not cover" an act committed by an officer outside the scope of their duties or powers. Id. at PAGEID 339. He explained his opinion that officers could be held personally and jointly and severally liable.

4

The email to Mr. Eckert and Ms. Schlueter addressed a fourth matter, though it was not incorporated into the Board minutes. Mr. Gjostein reported on the status of BHM's negotiations over a lease – one that would replace the lease mentioned above in relation to the December 2009 Board meeting as being unfavorable to BHM. See Gjostein Supp. Decl. at ¶¶ 3-4. Mr. Gjostein admits that on BHM's behalf he participated in discussing the terms of a new lease with the other party to the contract. Id.

The Board minutes included Mr. Gjostein's statement that his email was "legal advice." Doc. 31-1 at PAGEID 339. The minutes also referred to Mr. Gjostein as being part of a "legal committee" for BHM. Id. at PAGEID 340 ("Dave Brunton will join Tom Gjostein so BHM will now have a legal committee.").

Mr. Gjostein has not offered a sufficient response to these new pieces of evidence. He does not dispute that he wrote the email or deny the contents of it. Instead he argues that Mr. Eckert "sought information," not legal advice, and that the comments he made in the email "are so basic that any Google search could give the same information and code sections." Doc. 34-1 at PAGEID 363. This argument is without merit. The email indicates that Mr. Eckert wanted Mr. Gjostein's responses to four issues that Mr. Gjostein categorized as relating to the use of copyrighted works, EEOC law, the corporate veil rule, and a lease counter-offer. And the email and Board minutes make clear that "legal advice" is what Mr. Gjostein gave to Ms. Schlueter, Mr. Eckert and the Board. The Court finds that Mr. Gjostein's advice drew upon his legal training and knowledge and was not the product of what any non-lawyer could have discovered online. Mr. Gjostein stated that he researched the relevant law on the copyright, EEOC and corporate veil issues which Mr. Eckert had raised. Mr. Gjostein applied the law in those areas to BHM's factual circumstances and reached conclusions about the actions which BHM legally could or could not take. Mr. Gjostein directed that his legal analysis and advice be communicated to the full Board, which made decisions consistent with his advice.

The Court thus finds that the April 5, 2011 email and Board minutes establish that an attorney-client relationship existed between Mr. Gjostein and BHM at about the time Mr. Gjostein was completing his term as a Board member. This evidence shows that BHM, acting through Ms. Schlueter, Mr. Eckert and the Board, reasonably believed that the relationship existed and that Mr. Gjostein was advancing the interests of BHM. See Hamrick, 79 F.Supp.2d at 875. And this relationship continued even after Mr. Gjostein was no longer a Board member. BHM has submitted emails from as recently as 2017 in which Ms. Schlueter, writing to others at BHM, referred to Mr.

Gjostein as "our BHM attorney" and "Attorney Tom Gjostein." Doc. 8-6 at PAGEID 82; Doc. 8-7 at PAGEID 85-86; Doc. 8-11 at PAGEID 101.

### C. Substantially Related Matter

A "substantially related matter" is "one that involves the same transaction or legal dispute or one in which there is a substantial risk that confidential factual information that would normally have been obtained in the prior representation of a client would materially advance the position of another client in a subsequent matter." Ohio R. Prof. Conduct 1.0(n).

The evidence establishes that BHM consulted Mr. Gjostein about intellectual property issues generally. As discussed above, he advised BHM about the propriety of its use of a set of DVDs. BHM also later looked to him about BHM's "liability/responsibilities" in using a song in one of its video presentations. Doc. 8-7 at PAGEID 84. Mr. Gjostein responded with an email stating that he would "do some research and try to tap some colleagues for their thoughts" and would "get you an answer soon." Doc. 8-8 at PAGEID 87. At the end of the email, he put his name, followed by "Attorney & Counselor of Law" and then listed the name, mailing address and telephone number of his law firm. Id.

BHM has also demonstrated that the scope of Mr. Gjostein's copyright advice to BHM reached the manual that is the subject of this lawsuit. BHM again proves this in its supplemental filing. Board meeting minutes from September 6, 2011 reflect that the Board considered the need to protect the use of its "manuals" and "materials." Ms. Schlueter and BHM were concerned about the use of their manuals by other groups and wanted to establish a way to ensure that only those entities with "integrity" and a "Catholic identity" were using them. Doc. 31-1 at PAGEID 345. Mr. Gjostein advised that BHM should "copyright all our documents" and form a policy as to which groups would be allowed to use the materials. Id. He further advised that BHM should require those groups to sign a license and promise "not to change" or alter BHM's materials without permission. Id.

Mr. Gjostein's legal advice is substantially related to this lawsuit. It is undisputed that the "A Guidebook to Healing" manual at issue here was in existence and distributed by BHM at the time of the September 2011 Board meeting. See, e.g., Diana Davis Aff. at ¶ 3 (bookkeeper at BHM who states that the manual has been used in its present form since at least 2005). It is also undisputed that the manual was one which BHM did in fact permit other groups to use. See Schlueter Decl. at ¶ 12. Thus, in filing this lawsuit Ms. Schlueter is attempting to establish copyright protection over a work for which Mr. Gjostein advised BHM how to protect and license in 2011. Ms. Schlueter now claims that

she, not BHM, owns the copyright, and that she allowed BHM to use the manual pursuant to an implied license by which she was supposed to be paid a royalty.

The Court also notes a similarity in the stance and concerns of BHM in 2011 with those of Ms. Schlueter in this lawsuit. In 2011, BHM wanted to prohibit the use of its materials by groups whose beliefs or values did not align with BHM's values. Mr. Gjostein offered legal advice to BHM on how to accomplish that aim. Similarly, in this lawsuit Ms. Schlueter alleges that BHM should no longer be allowed to use the manual because the mission of BHM has changed since her resignation and she not comfortable with "being associated with BHM." See Am. Compl., ¶ 18.

Mr. Gjostein's involvement in advising BHM in copyright issues also establishes a substantial likelihood that he acquired information, including confidential information, from BHM. This would include information relating to ownership of the manual, steps taken to register or protect the manual, and licenses given by BHM to other groups. It would also include information that this lawsuit puts directly at issue, such as the existence of an implied license or understanding between Ms. Schlueter and BHM concerning permission to use the manual, and, if a license did in fact exist, the terms of their agreement, including any royalty payments.

For this reason too the Court further finds that there is a significant possibility that Mr. Gjostein could be called as a fact witness as to non-privileged matters. See Ohio R. Prof. Conduct 3.7 (Lawyer as Witness) (stating the general rule that a "lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness"); 155 N. High, Ltd. v. Cincinnati Ins. Co., 72 Ohio St. 3d 423, 426, 650 N.E.2d 869, 871 (Ohio 1995).

### III. Conclusion

Accordingly, the Court finds that BHM has established a reasonable possibility that a conflict of interest has actually occurred, and it finds that the public interest in requiring professional conduct by an attorney outweighs the competing interest of allowing Ms. Schlueter to retain Mr. Gjostein, particularly since she still has lead counsel to represent her.

Defendant's motion to disqualify Thomas Gjostein as counsel for plaintiff (doc. 8) is GRANTED. Plaintiff's motion for leave to file a sur-reply (doc. 27) and defendant's motion for leave to file supplemental memorandum and exhibits (doc. 31) are GRANTED.

s. James L. Graham
JAMES L. GRAHAM
DATE: November 21, 2018                     United States District Judge